15 minutes for plaintiff, 15 minutes to be shared by defendants. Mr. Lovey for plaintiff appellate. And counsel, you know, we've been rushed, but I think the court's pretty well up on this case, so you might focus on what's different between Price and Webb. I mean, the arguments that were made already, I think, were that Price and Webb are different. I think on both sides we have well in hand. I appreciate that, Your Honor. And we do believe that the evidence in Price showing the frame is even stronger than it was in Webb. You know, there was a guilty plea by Bray for framing Geneva, France. Geneva, France, of course, survived summary judgment. That's Price's co-defendant. So this case, too, should have gone to a jury. But where I want to start, Your Honor, is where I ended. Sorry, when you say France survived summary judgment, in a civil case? Yes, Your Honor. And then was settled by the government. I want to start where I ended in Webb, though. And that is this very, very bothersome fact that the OIG report and all of Bray's incriminating statements did not make it to plaintiff's counsel until summary judgment was briefed, and in Price's case, until it was already decided. And I hope this Court is as troubled by that as we are. This evidence, the Bray statements where he said this was all a frame, the OIG report where the OIG for the United States concluded that this was a totally corrupt investigation, none of that was turned over to the plaintiffs before they moved for summary judgment, and before summary judgment was granted, and then before they moved for summary judgment again, and before summary judgment was granted. What's the remedy on that? Just for the Court to reconsider it, or for us to sanction the counsel for the other side, or what remedy do you have? Well, indirectly, the remedy is we should look at Price on appeal differently than the district court, because the facts in our brief were not available to Judge Boyko when he decided summary judgment. And so the remedy is you should look with skepticism on the district court's conclusion, because he didn't have the whole picture, and it wasn't fair to the district court. I'm not blaming the district court. And as far as sanctioning it, none of the attorneys before you, I believe, are responsible for it. They are not the trial attorneys as an appellate attorney. But the remedy is I would hope that there would be some hard questioning on why it is that the OIG report and the Bray statements weren't turned over, even though they existed prior to plaintiff moving for summary judgment. That's not the way cases should work. They should not be able to submit an affidavit saying, oh, we relied on Bray in good faith, knowing that there's a stack of paper saying Bray is saying this is all a sham. And maybe I should let it go, Your Honors, but I think it's a big deal, and I hope, as I said, the Court is as troubled by I am, that they tried to get rid of our case without giving us that evidence. But our review is de novo in any event. That's true. And so you guys have a different perspective than Judge Boyko did. And you know, and there's a bunch of facts not discussed in Judge Boyko's opinion about the price deal that suggests that it, too, was a sham. Bray says, I told Lucas, you know what, I couldn't get Price to do a drug deal. And Lucas says, turn off the wire, and you got, you know, the other guys are monitoring the wire, and then they have this conversation. And Bray says, I explained it to them, just like we did in Ballard, just like we did in Williams. You know, they were using stand-ins, not just in this case, not just in Webb, but in other cases, too. They had run out of people to get, and it didn't stop Lucas, and it didn't stop Bray. And according to Lucas, if the jury decides, I mean, according to Bray, if the jury decides to believe this testimony, it's very disturbing. I mean, it's very upsetting, and it's not what we're used to, and it's not what we expect to see from federal agents. But keep in mind, they prosecuted Lucas. Granted, they didn't convict him, but it was sufficiently, the government at some point believed there was sufficient evidence to prove, beyond a reasonable doubt, that Lucas had violated Price's and Webb's civil rights. And even if the jury- They didn't expect Bray to come in and testify under oath that it was all a lie, either, though, did they? No, and he recanted, and we don't know why he recanted. As I suggested, we never got to depose Lucas and ask him, did you talk to Bray before he recanted? We don't know why he recanted. But they believed they could prove it beyond a reasonable doubt, and the plaintiff here should at least get a trial on whether we can prove it by a preponderance. I could talk specifically about the Price deal, about, you know, we've laid it out in our brief. It was at least, of the statements in the grand jury, in the affidavit, in the grand jury testimony, just about everything Lucas said was a lie, starting at the beginning with the 205 call, when Lucas says, I monitored the number, and he dialed Price's number. He didn't dial Price's number. He dialed his own girlfriend's number. That's a lie. Then, on the recorded call- Are you basically saying that if we need line-by-line lies, there's more for Price than for Webb? I think there's-I think it's comparable, Your Honor, but the reason I'm hedging is because I don't have it in front of me. Okay, but you seem now to-that is, you've thrown out a couple of things on Price that are pretty specific. That's true. I guess that's the way I prepared my argument, was that I came up with ten specific lies. With Webb, Your Honor, it's one basic thing. Webb's guilty. He wasn't guilty. He knew he wasn't guilty. Let's stick to Price. Bray told him he wasn't guilty. Two things, then, with respect. Again, you've got a battalion on the other side. One, from the questions I asked before, is there anybody else that was, in fact, before the grand jury other than Lucas, with respect to Price, and are there documents of any sort that anybody other than Lucas would be implicated in? Well, to duck your question about anybody besides Lucas, the case law is that you can't use an intermediary to accomplish the same thing. That's the Gregory case and the Justin Juris case. It doesn't matter who is standing in front of the grand jury. If you knowingly put somebody else up there or have knowledge that they're testifying falsely- The other guys, I'm talking here, Mayer, Metcalf, Faith, and so on, he's not their cat's paw. You can't get there. That's why I'm asking about did they do something that got before the grand jury, number one, and number two, the question I asked earlier, does that matter, that if the grand jury indictment essentially shield falls, then can you get everybody else for what you might consider lesser kinds of constitutional evils? And the answer to both is yes. And as far as Faith and Metcalf, Faith and Metcalf lied about having followed Price from his house to the scene of this drug deal. About the car leaving that place. That's a big deal, Your Honor. They need to tie Price to this drug deal. It's got nothing to do to him. And they said, oh, well, we followed Price from his- But when you said they said that, in what way did they say that? In other words, was it a report that got before the grand jury? Well, they relayed it to Lucas, who put it into his DEA 6 report, and then relayed it to the grand jury. Do we know that Lucas testified before the grand jury about what they said about Price- Yes, sir. Without having it in front of me, I'm not going to bet my whole case on it, but my understanding is yes, and I believe we're going to confirm that Lucas, in fact, told the grand jury that Faith and Metcalf followed him from the house. I believe that is true. And the reason he said that is because they told him. And I think they all knew it was a lie because Lucas was there, but in the very least, they're saying that it was a lie. The second fact- Why was that so important? Because that's the person that got involved in the drug deal later, so they saw him leave the house. No, because this drug deal had nothing to do with Price. They're having a drug deal with somebody named English. Price's house. No, it wasn't at Price's house. No, no, I mean when they said the car left Price's house. They said that, yeah, to get Price into the deal, they said, oh, well- That's what allegedly ties Price in. We followed Price there. Without saying we followed Price there, then they're just having a drug deal with somebody named English. It's got nothing to do with Price. So they lied and said they followed Price there. The second thing they lied about was the way this thing went down. They had a recorded call, a recorded conversation from inside the home where English is saying nothing incriminating, and then Bray comes out and says to Lucas and to Faith and Metcalf, well, we got this new plan. We're going to go to this other location on South Adams, and we're going to do it through a female intermediary. And they let him go with that story, even though because they were monitoring the wire, they knew it was totally false. None of that happened. They were just making it up. And, you know, as we said in our brief- Any other defendants beyond Faith and Metcalf, then? You've got Verheely here because Lucas- Well, Faith, Metcalf, and Verheely. Verheely is obviously a more minor player, but there's a question about who pointed the finger at Price. Lucas says that Faith and Metcalf's were the ones that ID'd Price. Metcalf denies that he ever ID'd anybody. Faith points the finger back at Lucas, and Verheely says that it was Faith, Metcalf, and Lucas who made the ID, so let me out. And, you know, as we said in our briefs- That's the side you want to win, isn't it? Well, the jury-we don't want the empty chair. So the jury-at the end of the day, the jury will sort this out is what we're suggesting. Okay. You can have your remaining time for rebuttal. Okay. Gentlemen, on your side, same 5-5-5. All right. Proceed. Lowell Sturgill again from the Department of Justice, and I have three clients in this case. First, I have DEA Special Agent Robert Cross, and the plaintiffs in their brief have advised the court that they're no longer seeking recovery from Cross, so they've abandoned their claims. I have DEA Task Force-designated Task Force Officer Verheely, and the only claim that plaintiffs make against Verheely is that Verheely identified Davis or Price as being involved in the deal. And interestingly, when you heard their litany of who said what about whom, you didn't hear him say that anybody said that Verheely identified the plaintiff, and he didn't. Verheely's affidavit explains that although he was at the scene on surveillance and he saw somebody get out of the car, he was not in a position to identify who the individual was. He did not testify before the grand jury. He never made any identification of the plaintiff, so there's no claim at all that Verheely should be in this case. Maybe I didn't hear it. It was very quick, but I thought he was saying that one of the other people, Faith or Metcalf, said that Verheely did. Did I mishear that? He didn't. He went through the whole list, and then you're waiting for, oh, who says Verheely? It was nobody, because there wasn't anybody. According to yours, he wasn't a player at all. It wasn't. He was on surveillance. The other thing they say is that he monitored the telephone calls before the deal and that he monitored the live transcription of the drug transaction. There's no evidence in the record to support either of those allegations. He was in the room while the telephone calls were being made, but he could only hear Bray's side of the conversation, so he didn't know what was going on in terms of the other side of the call, and he didn't have the cobble phone on him during the drug deal, so he wasn't hearing the live transaction during the drug deal, and there's no evidence in the record to the contrary. Who's your third player to be named? The United States, and we have the same basic arguments there. But I do want to take some time to talk about this business, about the allegations that the government withheld evidence wrongly, and there are three points to make on that. First of all, there was no misrepresentation about the government, about what documents it was giving the plaintiffs voluntarily. Second, there was no improper withholding of evidence, and third, the district court looked at that evidence and found that it was all cumulative, so there really was no new material evidence in this later disclosure. First of all, with respect to the misrepresentation idea, the government specifically and accurately identified to the court what it was giving them voluntarily. All of the trial exhibits from the Lucas criminal trial and all of the testimony, and then they specifically explained what that was. And when you look at the district court's order, discovery order, the district court took what the government said and put that in its order. The court understood what it was getting when the government voluntarily disclosed this Lucas. Your first disclosure was not in response to a discovery request?  Go ahead, then. Second, there was no further discovery request to which my clients withheld any information, so there's no withholding going on here. And then third, the evidence from the OIG report, the district court looked at it and found it cumulative. That's as to substance, but are you saying that the OIG report and the Bray, I guess four or five statements, was in the government's possession but simply was not asked for appropriately? That's correct. Then how, in fact, did it come in then? Well, two ways. First of all, if you look at Lee Lucas's affidavit in the case or declaration, Lucas goes through those early allegations from Bray and explains why they were not authentic or to be relied upon.  I'm saying if your position is we gave stuff voluntarily, nobody asked for anything anymore, then I say, well, then where did the OIG and the Bray statements come from? Well, not the OIG statements, but the Bray statements were known to Lucas. And Lucas, first, at the Lucas criminal trial, all of this came out.  Mr. Roth can tell you word for word what it was, but it all came out, all of these original statements by Bray, and Mr. Roth took him through that and said, were these truthful or not? And Bray, what he said was that he made those statements. They were known to Lucas originally. Right, and they were known to plaintiffs because plaintiffs had all of the testimony in the Lucas trial when they filed their summary judgment responses in this case, so they knew. What about the OIG report? The OIG report, first of all, is not later, but it's not admissible evidence for the conclusions that they made and anything else in it is hearsay. And the OIG didn't find that Lucas lied before the grand jury in these cases. The OIG found that there were certain problems with Lucas's DEA-6 report, but, again, no finding that Lucas lied before the grand jury, and if you look at the DEA-6 and the problems the OIG found, they were minor problems with the 6 that did not relate to Lucas's trial, Lucas's testimony in the grand jury. Lucas in the grand jury testified that. Okay, we can look that up. Okay. Anything else, judges? Okay, thank you. May it please the Court. Again, I'm Tom Roth. I represent Mr. Lucas. I think it's important to look at the grand jury testimony. Counsel referred to it but didn't have it. I have it. There is no reference in that grand jury testimony whatsoever as to what Metcalf and Faith saw or did, none. I'll read to you exactly what Mr. Lucas said in the grand jury. On October 25, 2005, in Mansfield, Ohio, an informant made tape-recorded telephone calls to Ronald Davis setting up a purchase of two-and-a-half ounces of crack cocaine. Ronald Davis is Price's? Yes. Mr. Price was a fugitive from justice using a false name. That's Price. Right. I went with the informant to an address on South Adams Street. The informant got out of the car, met with Ronald Davis. The informant had a tape recorder. At this time, Ronald Davis had a pistol in his hand when he met with the informant. Ronald Davis directed us to go over to his residence down a couple of streets, 121 Glessner Avenue. There is no reference to anything Metcalf or Faith said. As a matter of fact, again, if you look at this testimony word for word, there is not a single falsity in it. If you look at this grand jury testimony and parse it out for Price and then parse it out for Webb, or do we throw it all in together and say if there is one false statement in it? I think you have to look at it line by line. That's what a plaintiff did in his brief, and that's what we did in our brief. What we showed in our brief is that every one of these statements is not only true, it's corroborated. You have to understand, Your Honor, not only were the transactions with Mr. Price recorded and the transactions with Geneva, France recorded, but the communications between the officers were all recorded. There were ten recordings of this one transaction, and everything these officers said to one another in different vehicles is recorded. First of all, Mr. Lucas makes no reference to what anybody saw in the grand jury. As Your Honors know, it's quite common to use hearsay in the grand jury, and that's basically what Mr. Lucas in large measure did. In some instances, it was based on his own personal observations. In some instances, it was based on the observations of others. Everything that Mr. Lucas says here is corroborated, and what we do in our brief is we painstakingly go through every line and show you not only does Mr. Lucas say this, but this is on a recording. He got this from a recording. When he says that Mr. Bray said this, we know Mr. Bray said it because he tells him it on a recording. So there's nothing false, again, in the grand jury. Now, Your Honors ought to understand. Again, I represented Mr. Lucas at his criminal trial. Mr. Bray testified unequivocally that he used stand-ins, and it was his decision, his decision alone. Not a single law enforcement officer knew about it, and not a single law enforcement officer participated in it. He said early on, in order to gain favor from the government, because he knew they were interested in Lucas, he lied about Mr. Lucas. He said Mr. Lucas was involved in the Webb stand-in and was involved in the Price stand-in. And as the interviews progressed, and he failed polygraph after polygraph after polygraph, they confronted him with his failings, and he finally said, you got me. I lied. Lucas had nothing to do with any of this. And they knew, the government knew years before the Lucas indictment of the recantations. This didn't just happen out of the blue in the trial. I knew of the recantations because, as Jenks material, right before the criminal trial, I got the prior statements. So I knew what had happened, and the government knew what happened long before. The government has an ethical obligation not to go with lies, so they put him on the witness stand and honestly and candidly said, had him admit that he had lied about Lucas throughout the whole course. As they pursued the prosecution at that point. So was I, Your Honor, and basically it's important. What they charged Lucas with had nothing to do with stand-ins, nothing to do with anything, but there were minor statements made at trials that they considered to be false and statements made in his DEA sixes. But he was not charged with a single false statement in his two grand jury presentations or any grand jury presentations at all. They were just very pro forma, basically recitations of facts, generally based on hearsay. Thank you, Counsel. Thank you very much. Thank you, Your Honor. Stan Downing, I represent obviously Richland County, which I failed to mention the first time around, but also Sheriff Sheldon, Captain Faith, and Sergeant Mayer in the Price case. Sergeant Mayer had no involvement in this buy. Sheriff Sheldon had no involvement in this buy. Richland County was dismissed at the lower level because in the absence of a constitutional violation, it's not possible to maintain a Monell claim. So what we're really here to talk about is Captain Faith and his involvement. And as I think one of the judges noted during an earlier statement by Mr. Sturgill, Officer Riley was a tangential player because he was just doing surveillance. Well, essentially that's what Richland County did after the DEA became involved in these buys in late August, early September of 2005, and this particular buy is no exception. Captain Faith and Detective Metcalf were in a car. You represent Metcalf also, right? I do not. Does anybody represent Metcalf? He is present but not arguing today. But Faith and Metcalf were in the same car. Yeah, that's what I thought. I was trying to... Traveling away from... This is the point about saying that they saw the car leave the house. Right. And what they saw was they saw a gentleman that fit the ID. They thought it was Davis, Price, whatever name he was using, an alias at the time. They thought they spotted him. They knew Captain Faith, who authored an affidavit which you folks are aware of, had seen the silver car at the Glessner address prior to this day. That's where Price was supposed to be leaving. Where he was leaving. That was the assumption, that he had left that location to go over to the buy. He heard over the phone the arrival of the gentleman that he had just seen. There's an issue with the affidavit as to whether Captain Faith and Detective Metcalf turned and followed this gentleman or drove away. Captain Faith has explained it. He explained it to Ms. Thomas in an OIG interview. He explained it at the criminal trial for Lucas. He did not go back to the scene because then you would have three cars all watching this gentleman get out and go into a house. It was tangential. He was essentially conducting surveillance that day. So your position is there was a car, but it was driven by English, not by Price? You know, the way it's all shaken out, Your Honor, they thought it was Price at the time. English came forward, I think, and testified at the criminal trial. But what I just said, is that accurate? I think that. They claimed that there was a car. There was a car. There was a silver Caprice. It came in the report as a Lincoln. But it was a silver car that contained who they thought was Mr. Price. And the record actually reflects, I think, that Jarrell Bray thought this was actually Price who was involved in that buy. You know, aside from all that. So you're saying Bray thought it was Price. He had nothing to do with it. He didn't know it was English? He thought it was Price. Correct. I think the record reflects that. But as its impact on my clients, my clients... Your client said that's what he saw. What action was taken on that later? Anything?  They didn't see the buy. They weren't able to make out any portion of what occurred. And so when Mr. Ross stands here and tells you that Mr. Lucas didn't mention anything about what they saw or did that day, it's because it really wasn't relevant to what occurred. And some background about how these buys worked. Our officers are well-known in Richland County. They can't go in and make buys from people. They can't be close to scenes where buys are taking place. They have to get far away because they ID them. In one of the earlier cases, the black truck owned by one of my clients was ID'd by a drug dealer shortly before a buy took place. So we got it on tape saying that looks like Mayor's vehicle going by. So they can't be close. That's one of the reasons that when the DA got involved, they really took over, controlled the operation, and we had an officer who had done thousands of buys who could go in undercover and ID these folks. My clients had nothing to do with the prosecution, the decision to prosecute the charges to be lodged against Mr. Price. None of that. And, you know, one of the things that hasn't come up today in this argument is the fact that Mr. Price was essentially a fugitive from justice at the time this occurred, using an alias, committing criminal acts by impersonating another and selling drugs while he had been sentenced to spend seven years in jail in Michigan. And, you know, I don't blame Mr. Loewe for not addressing that in his opening, but I do think that that is a very important argument for this court to consider. You're saying that if a person should be in jail in another state for another crime, then he has no rights against being framed for a completely separate crime? I'm not saying that at all, Your Honor. But I am saying that his expectation of privacy is different. And I think it would be analogous to somebody who's on probation. Certainly a probation officer can enter a house, check to see whether or not there are drugs, check to see what the location of the individual is. But, again, if you're on probation and a Michigan probation officer should be able to do that, it doesn't mean a New York cop can bust into your New York apartment with no connection to it. I think this is a fugitive from justice. And so, in my view, it is analogous to a probation argument that these officers did. I should say Mr. Price had no expectation of privacy because he was a fugitive from justice. Okay. I think some of the cases that we cited are helpful in that regard. Thank you. Thank you, Your Honor. All right. Any whatever remaining time you have, Mr. Lowy, you can take off. Your Honors, the analysis on the grand jury as supposedly saving these law enforcement officers is the same as we've already talked about in Webb. Even as my colleague read the statements to the grand jury and he stopped, he read three false ones. The first one he said was that we telephoned Price. That's what he told the grand jury. He knew that was false because Bray had told him it was false. The second thing he said was he met with Price. Lucas knew that was false. Bray told him we aren't going to meet with Price. The third thing he read was that he had a pistol in his hand. The department's OIG concluded that that was a lie. I mean, yes, that's kind of a minor detail, but this guy can't say anything that's true. He just starts making stuff up. If he thought honestly it was Price, was that a false statement? If he believed, even in good faith, I'll give him that, that he saw a drug deal with Price, if Bray had duped him, then they should win. But that's what the district court had before. But then we got Bray's statements where he said... The issue here is we don't have to decide either way. We just have to decide whether there's a genuine issue or a material fact. Exactly, Your Honor. And you're not the jury, and you won't decide which version you want to play. So the two that you just said was he says we called Price, but actually they called some random person. They called some guy named English. Right. And that he met with Price, and that, again, that was the statement, with meeting with English. And that's really the foundation of the whole thing. It goes back to is there a genuine issue as to whether he could or did mistake one for the other. Or was reckless. And don't forget to look at the broader context of Operation Turnaround Abuses when they are using stand-in after stand-in after stand-in. Your Honors, there's more than the three he just read you. Count 13 and Count 14 of the government's indictment against Lucas annotates grand jury testimony that Lucas gave that the government says they're going to prove beyond a reasonable doubt was false. So that's Count 13 and 14 of the indictment. They quote literally verbatim from Lucas's grand jury testimony, and they say he has... Raise an interesting question as to whether probable cause would work the other way, because usually if something is plausible enough to be probable cause, it would be plausible enough to raise a genuine issue of material fact. I'm saying that's favorable to you. I don't know if you wanted to make the argument, but isn't the probable cause to indict Lucas evidence that there's a genuine issue of material fact as to the things that are said there? That's what I've been trying to say the whole time, is if they believe they can prove it beyond a reasonable doubt, then how can we not even get a jury question? I guess that's my way of saying it. But if it's good for me, I like it, Your Honor, even if I don't fully understand it. But what I do have here is about eight pages of transcript that the government says they're going to prove is perjury that Lucas gave to the grand jury. That's Counts 13 and 14. So this is not a good faith mistake. You know, they're still harping on the fact that Bray recanted. The record evidence in our brief shows they confronted him after he made the first statement and said, you failed to polygraph. And then he repeated the statement. He said, I don't know about any polygraphs, but me and Lucas made a deal. And then he did it again, and then he did it again. In other words, repeated that Lucas was guilty. So they're both... What about the discussion that we just had about saying that you people knew about these Bray statements because they had come up in the Lucas criminal trial? Well, that's what I wanted to talk about next, Your Honor. We got no discovery in the civil case, none. We didn't get any depositions, and we didn't get anything beyond what the government gave us. And Judge Boyko said, look, the government... They gave you voluntarily. Which they gave us voluntarily. And the government made a representation. The record site is document 158, page 3, of Lucas' response to the list of discoveries sought by plaintiffs. And at the top paragraph he says, we've given them everything that we have. We have given them the complete internal files of the United States Attorney's Office in Cleveland, the DEA, Richland County, and the law enforcement agencies involved. They told Judge Boyko they have everything. Everything. And then Cross repeated it in his Robertson brief. It sort of didn't answer the question. Did you, in fact, have or know about the Bray statements because the criminal trial had already happened? At the point of the criminal trial, there's a lot of transcripts. If those statements, if Bray's reference at the criminal trial, then we knew of the existence. But Judge Boyko said, you've got everything, they've given you everything, you get no further discovery, you get no depositions. So, I mean, it's a point for them that, well, it was referenced, but we still didn't have it and they still didn't give it to us. Did the district court, after looking at the OIG report, say it was cumulative? The district court did not have the OIG report until after he had already decided summary judgment in both cases. They said, on argument here, that after the judge looked at it, he said it was cumulative anyway. When we got back and said, look, you've already granted summary judgment in both these cases, but they've just given us this blockbuster report where we interviewed 50-plus witnesses, looked at thousands of pages of documents, and we've made conclusions that Lucas committed civil rights violations, lied. The district court entered a short order saying, I'm done with the merits. I've already told you that the broader operation turnaround context doesn't matter. Nothing, you know, if the word cumulative is used, fine. But this isn't cumulative. I urge your honors to look at this report. The district court made that finding. That's no prejudice to you. Well, here, you know, as we've pointed out, it's de novo at this point. There's no way, no way you could take a look at this report where they lay out an airtight case that Lucas has committed obstruction of justice. They say in here, in Webb and in Price, he has violated criminal law. It wasn't airtight enough to get Lucas convicted. Well, you know, maybe he's an outstanding lawyer. I've looked at the transcript. The government's case was a little bit all over the place. An acquittal doesn't, you know, as O.J. Simpson found out, an acquittal doesn't defeat a civil trial either. That's true, too. And, you know, we'd like a shot, too. You know, the case was tried in a very strange way, and it was confusing. But the acquittal obviously doesn't mean that there was no evidence. And the DOJ did an outstanding report, and they annotated that Lucas did, in fact, commit civil rights violations. And if it was cumulative, then he never should have granted summary judgment because he says, the OIG says unambiguously that Lucas has committed obstruction of justice, made false statements, reported false statements, and violated the civil rights. So it shouldn't have been cumulative. And, Your Honors, it shouldn't have been withheld. It should not have been withheld. They represented to Judge Boyko that we had everything, this report existed, and they still haven't explained why we didn't get it. So this is not a way a case should have been litigated. The judge made up his mind when he granted summary judgment the first time without giving us any discovery. We would urge that if you do remand, that we get a chance for a new district court judge. We cited the language of the case that there's some risk that the judge has already expressed opinions and it would be hard for him to revisit it. At least some of the plaintiffs won, and we're on the right side of that line. We should have a chance. Thank you, Your Honor. Thank you, counsel. Cases will all be submitted, and the clerk may call the next case.